IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-036

Filing Date: August 17, 2011

Docket No. 32,344

CYNTHIA AND PERFECTO PROVENCIO,

Plaintiffs-Respondents,

v.

STEVEN WENRICH, D.O.,

Defendant-Petitioner.

ORIGINAL PROCEEDING ON CERTIORARI
Frank Kenneth Wilson, District Judge

Sandenaw Law Firm, P.C.
Thomas A. Sandenaw, Jr.
Caralyn Banks
Las Cruces, NM

for Petitioner

Law Offices of James P. Lyle, P.C.
James P. Lyle
Albuquerque, NM

for Respondents

OPINION

BOSSON, Justice.

{1}     Since we issued *Lovelace Medical Center v. Mendez*, 111 N.M. 336, 805 P.2d 603 (1991), more than 20 years ago, this Court has not had an opportunity to clarify whether a doctor who negligently performs a tubal ligation procedure, but who then informs the patient of her continued fertility, may be sued for the future costs of raising a subsequently conceived child to the age of majority. We hold that those particular damages are only available when a doctor has breached a duty to inform. Our Court of Appeals held otherwise, concluding that notice of continued fertility, or lack thereof, was merely a factor

1

for the jury to consider as questions of causation and comparative fault.  Accordingly, we reverse the Court of Appeals and affirm the district court's dismissal of this action.

**BACKGROUND**

{2}     On December 12, 2002, Defendant Dr. Steven Wenrich delivered Plaintiff Cynthia Provencio's fourth child via caesarean section.  Prior to surgery, Mrs. Provencio consented to Defendant contemporaneously performing a tubal ligation procedure on her sole fallopian tube because she did not wish to have additional children.  After completing the surgeries, Defendant sent a portion of what he believed was ligated fallopian tube to a laboratory for analysis.  The resulting pathology report revealed that the tissue Defendant had ligated was ligament, not fallopian tube, and Plaintiff still could conceive children.

{3}     Mrs. Provencio's first follow-up appointment with Defendant occurred on either December 18 or 19, 2002, several days after Mrs. Provencio was discharged from the hospital.  At this appointment, Defendant told Mrs. Provencio that the tubal ligation surgery was unsuccessful; that he had failed to "get it."  At the same appointment, Defendant informed Mrs. Provencio that only a hysterosalpingogram (HSG) test would conclusively reveal the extent of her continued fertility. Defendant provided Mrs. Provencio with a laboratory form for an HSG test.

{4}     For reasons that are not clear from the record, Mrs. Provencio never returned to Defendant's care after this initial appointment.  Mrs. Provencio did, however, complete an HSG test in November 2003, some eleven months after her last appointment with Dr. Wenrich.  The results of this test confirmed that Mrs. Provencio's fallopian tube remained open.  Approximately five months after receiving the HSG test results, Mrs. Provencio conceived her fifth child with her husband, Plaintiff Perfecto Provencio.  Mrs. Provencio eventually gave birth to a normal, healthy child.

{5}     On December 12, 2005, Mr. and Mrs. Provencio filed suit against Defendant for wrongful conception and battery.  As to the wrongful conception claim, the only damages for which Plaintiffs sought recovery were the costs associated with raising Mrs. Provencio's fifth child to the age of majority and punitive damages.  Plaintiffs did not seek other damages for the costs of a second tubal ligation surgery or any other harm associated with the failed sterilization.

{6}     The case proceeded to trial where, at the close of Plaintiffs' case in chief, Defendant moved the district court for judgment as a matter of law on each of Plaintiffs' claims.  *See* Rule 1-050(A) NMRA.  In granting Defendant's motion on the tort of wrongful conception, and particularly Plaintiffs' claim for the costs of raising Mrs. Provencio's fifth child, the district court ruled that "the physician's failure to timely inform the patient of the failed sterilization is an essential element" in wrongful conception.  The district court observed that because "Plaintiffs were well aware of the failed sterilization," and "were fully advised the sterilization had failed by the time the parties' child was conceived," they could not as a

2

matter of law establish an essential element of their wrongful conception claim. Because of this, Mr. and Mrs. Provencio could not recover the costs of raising their child. In the alternative, the district court ruled that by providing Plaintiffs with information about the failed procedure, Defendant had broken the causal chain as a matter of law.

**{7}** After making these rulings, the district court asked Plaintiffs if they wanted to proceed on a claim for different, albeit smaller, damages based on the negligently performed sterilization procedure alone, such as the costs of a second surgery, or emotional suffering, but without recovering child-raising expenses as set forth in *Mendez*. Plaintiffs declined, and the district court entered judgment in favor of Defendant.

**{8}** The Court of Appeals reversed, holding that *Mendez* did not establish a distinct tort of wrongful conception and that failure to inform was not a prerequisite to recovery for the costs of child-raising. *Provencio v. Wenrich*, 2010-NMCA-047, ¶ 9, 148 N.M. 799, 242 P.3d 366. The Court of Appeals concluded that a claim for wrongful conception is nothing more than a standard claim for medical negligence, albeit one that allows for special damages. *Id.* ¶¶ 9-10. The Court of Appeals explained its reasoning:

> Because a "wrongful conception" action is nothing more than a normal medical malpractice action with a unique type of damages, Plaintiffs, as in any medical malpractice action, "ha[ve] the burden of proving that: 1) [D]efendant owed [them] a duty recognized by law, 2) [D]efendant failed to conform to the recognized standard of medical practice in the community, and, 3) the actions complained of were the proximate cause of [P]laintiff[s'] injuries." *Schmidt v. St. Joseph's Hosp.*, 105 N.M. 681, 683, 736 P.2d 135, 137 (Ct. App. 1987). Plaintiffs do not, however, have to prove that Defendant failed to disclose that the sterilization procedure was unsuccessful, and the fact that Defendant here undisputedly informed Plaintiffs that the sterilization was unsuccessful does not automatically bar Plaintiffs' case from going to the jury.

*Provencio*, 2010-NMCA-047, ¶ 10.

**{9}** The Court of Appeals also rejected the district court's causation analysis, and correctly so. *Id.* ¶¶ 13-16. Because the independent intervening-cause doctrine does not apply to a plaintiff's own negligence, Defendant could not have interrupted the causal chain as a matter of law by disclosing to Mrs. Provencio that she was still fertile. *Id.* ¶ 13. Relying on general principles of New Mexico negligence law, the Court of Appeals reasoned that "the effect of the doctor's disclosure" goes to the issues of causation and comparative fault, both within the province of the jury. *Id.* ¶ 11. Because "reasonable minds could differ on the question of whether and to what extent [Defendant's] actions and the actions of Plaintiffs caused the pregnancy," the Court of Appeals determined that the case should have gone to the jury to determine liability and, if needed, apportion fault between the parties. *Id.* ¶ 12.

3

**{10}** We granted Defendant's petition for a writ of certiorari to clarify the scope and meaning of our *Mendez* opinion. *Provencio v. Wenrich*, 2010-NMCERT-006, 148 N.M. 584, 241 P.3d 182.

**DISCUSSION**

**{11}** As our resolution of this appeal depends on the applicability of *Mendez*, our seminal opinion in this area, we begin by reviewing that case. The facts in *Mendez* are straightforward. Mrs. Mendez underwent an unsuccessful tubal ligation procedure in which the doctor negligently ligated only one of her two open fallopian tubes. *Mendez*, 111 N.M. at 337-38, 805 P.2d at 604-05. Compounding his negligence, the doctor never informed Mrs. Mendez that the surgery had failed. *Id.* Unaware of her continued fertility, Mrs. Mendez took no birth control measures and "within months of the surgery" conceived a healthy child. *Id.* at 338, 348, 805 P.2d at 605, 615. Among other claims, the *Mendez* plaintiffs sued for the cost of raising the unexpected child to the age of majority, a substantial sum. *Id.* at 348, 805 P.2d at 615. In resolving *Mendez,* this Court analyzed the nature of the plaintiffs' various injuries and the damages that must be available, as a matter of sound policy, to compensate them for the full extent of those injuries. *Id.* at 341-54, 805 P.2d at 608-21.

**{12}** In a seminal opinion, we held that New Mexico would join a minority of jurisdictions which recognize damages resulting from the birth of an unplanned, yet healthy child. *Id.* at 345, 349-50, 805 P.2d at 612, 616-17. We specifically held that damages could include the costs of raising an unexpected child to the age of majority. *Id.* In so doing, we joined what was, and to this day remains, a small number of jurisdictions which permit full recovery for child-rearing costs with no offset to the doctor for any benefits that the child might provide the parents over the course of their lives. *Id.* at 350-53, 805 P.2d at 617-20; *see also Chaffee v. Seslar*, 786 N.E.2d 705, 707 (Ind. 2003) (observing that New Mexico, California, Oregon, and Wisconsin are the only states that permit full recovery for child-rearing costs without a potential offset to the doctor).

**{13}** In the current case, Plaintiffs urge us to adopt the Court of Appeals opinion and hold that "in an ordinary medical malpractice claim stemming from a negligently performed sterilization procedure, the cost of raising a child may be recovered when a doctor's negligence causes the birth of an unwanted child," *regardless* of whether that doctor informs the patient about the failed procedure. *Provencio*, 2010-NMCA-047, ¶ 9. In other words, damages—the cost of raising an unexpected child—would flow solely from the negligently performed tubal ligation, even if the doctor informed the patient about the unsuccessful procedure and the patient's continued fertility. The jury would weigh the effect of the notice, or lack of it, when assessing causation. Under Plaintiffs' reading of *Mendez*, it would fall on trial counsel to present factual arguments to the jury regarding notice and the nature of the patient's subsequent conduct. If sufficiently persuaded, the jury could award the costs of child-raising, or a portion thereof, notwithstanding the patient's full knowledge and awareness of her potential for conception.

4

**{14}** Naturally, Defendant disagrees. According to Defendant, the issue here is not causation but duty. Defendant contends that the particular damages discussed in *Mendez* flow from the breach of a duty to fully and timely inform the patient of her continued fertility. Under Defendant's reading of *Mendez*, once a doctor sufficiently notifies a patient that she remains fertile following an unsuccessful sterilization procedure, even when caused by medical negligence, liability for child-rearing costs, as opposed to lesser damages like the cost of a second sterilization procedure, terminates as a matter of law.

**{15}** As a preliminary matter, we agree with the Court of Appeals' assessment that wrongful conception is not a distinct tort. It is well-established among courts and scholars that wrongful conception sounds in the law of medical negligence. *See, e.g., Procanik v. Cillo*, 478 A.2d 755, 760 (N.J. 1984) ("The terms 'wrongful birth' and 'wrongful life' are but shorthand phrases that describe the causes of action of parents and children when negligent medical treatment deprives parents of the option to terminate a pregnancy to avoid the birth of a defective child."); W. Page Keeton et al., *Prosser and Keaton on the Law of Torts* § 55, at 370-73 (5th ed. 1984); Mark Strasser, *Misconceptions and Wrongful Births: A Call for a Principled Jurisprudence*, 31 Ariz. St. L.J. 161, 162 (1999) ("[T]he claim in each of these kinds of cases is that but for a professional's negligence with respect to the mechanics of contraception, an unwanted conception would not have taken place." (footnotes omitted)). Like any medical negligence action, the plaintiffs in a wrongful conception claim "'ha[ve] the burden of proving that: [(]1) [D]efendant owed [them] a duty recognized by law[,] [(]2) [D]efendant failed to conform to the recognized standard of medical practice in the community [,] and, [(]3) the actions complained of were the proximate cause of [P]laintiff[s'] injuries.'" *Provencio*, 2010-NMCA-047, ¶ 10 (quoting *Schmidt*, 105 N.M. at 683, 736 P.2d at 137).

**{16}** We are of the view, however, that this case is fundamentally about duty, which is for the court alone to define. Before the jury can resolve any factual matter, like causation, the court must first frame the relevant law. In a negligence action, this means the court must first find an actionable duty of care and then define the nature and scope of that duty. *See Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶¶ 6-10, 134 N.M. 43, 73 P.3d 181. Neither party disputes that Defendant owed Plaintiffs a duty of reasonable medical care. The parties, however, do dispute the nature and scope of that duty, and whether it is satisfied by the doctor providing adequate and timely notice to the patient about ongoing risks of an unsuccessful sterilization procedure.

**{17}** We recognize that *Mendez* does not clearly resolve the question of duty. In fact, *Mendez* appears susceptible to multiple interpretations, some of which support the Court of Appeals opinion and some of which do not. For example, we stated in *Mendez* that the tortious conduct was *both* "the doctor's negligence in performing the sterilization operation and failing to inform the mother of the unsuccessful outcome." *Mendez*, 111 N.M. at 342, 805 P.2d at 609. Yet, at other points in the opinion, we appear to characterize the tortious conduct as the negligently performed surgical procedure alone without including the effect of a failure to warn. *Id.* at 342, 345, 805 P.2d at 609, 612.

5

**{18}** We recognize that any ambiguity in *Mendez* is due to its concern with damages—whether New Mexico would recognize the recovery of child-raising costs as a matter of policy—rather than a careful analysis of every aspect of the doctor's duty. *Id.* at 342, 805 P.2d at 609 (stating that the "fundamental question on the merits issue in this appeal is a question as to [the] measure of damages"). At the time, at least twenty-nine jurisdictions had rejected these same child-rearing damages on policy grounds. *Id.* at 350 n.1, 805 P.2d at 617 n.1 (listing the jurisdictions that had dealt with the child-rearing damages issue); Lori McCamey Bencoe, *Lovelace Medical Center v. Mendez: A New Approach to Damages Awards in New Mexico*, 23 N.M. L. Rev. 451, 452-54 (1993) (same). Unlike the current case, the facts in *Mendez* did not require a close analysis of duty. The doctor in *Mendez* had made no effort to notify his patient after the unsuccessful surgery, and Mrs. Mendez was not aware of her condition. We did not address the consequences, if any, if Mrs. Mendez *had* been made aware. Because *Mendez* does not provide clear guidance on this issue, we turn to legal principles that underlie medical negligence claims when based on wrongful birth and wrongful conception.

**{19}** As we previously mentioned, wrongful birth and wrongful conception are negligence actions, yet these claims are unlike other, more traditional claims for pre-natal medical malpractice. In the more typical prenatal medical negligence case, it is the child or the child's representative who asserts a claim for damages against a health-care provider, generally a doctor, for the child's own injuries. *See generally Siemieniec v. Lutheran Gen. Hosp.*, 512 N.E.2d 691, 697-98 (Ill. 1987). Commonly, the child claims that the doctor's negligence during pregnancy or at childbirth caused the child, who otherwise would have been born healthy, to be born with some defect or disease. *See Clark v. Children's Mem. Hosp.*, No. 108656, 2011 WL 1733532, at **12-13 (Ill. May 6, 2011). While the parents of the child might have derivative claims, such as loss of consortium, the essence of a prenatal negligence action is injury to the child itself.

**{20}** At the other end of the negligence spectrum is wrongful birth, which is a prenatal medical negligence claim based on injuries suffered by the parents, not the child. In jurisdictions recognizing these claims, wrongful birth is generally brought "by the parents of a child born with birth defects alleging that due to negligent medical advice or testing they were precluded from making an informed decision about whether to conceive a potentially handicapped child, or, in the event of pregnancy, to terminate it." *Chafee*, 786 N.E.2d at 710 n.3 (Rucker, J., dissenting). The nature of the parent's injury "is not that the defendant caused the child's condition, but that the defendant deprived the parents of the opportunity to make an informed decision." *Clark*, 2011 WL 1733532, at **12-13.

**{21}** Wrongful birth is appropriately characterized as a claim-based failure to diagnose or failure to advise the parents. The duty owed is part of the doctor's obligation to provide adequate care so that the parents can make an informed decision about the risks of pregnancy and childbirth; adequate care includes adequate notice. *See* Keeton, *supra* § 55, at 370 ("The defendants in [a wrongful birth case] are typically doctors charged with negligence . . . in failing to diagnose or inform the parents that the child might be born deformed—because of

6

a disease contracted by the mother or a genetic condition in one of the parents—in time to permit the termination [or avoidance] of the pregnancy.").[1]

**{22}** Wrongful conception is a closely related medical negligence claim that involves the birth of a healthy, but unplanned, child. *See Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 633 (Ind. 1991) (stating that wrongful conception "refers to a claim for damages sustained by the parents of an unexpected child alleging that the conception of the child resulted from negligent sterilization procedures or a defective contraceptive product"). Like wrongful birth, parents file wrongful conception suits on their own behalf, alleging injuries that they alone have suffered, including the costs associated with the pregnancy and the costs of raising an unexpected child. *See Phillips v. United States*, 508 F. Supp. 544, 545 n.1 (D.S.C. 1981). Both *Mendez* and the Provencio's case present claims for wrongful conception.

**{23}** There is a dearth of case law discussing the nature and scope of a doctor's duty in a wrongful conception case. Like our opinion in *Mendez*, most of the reported decisions in this area focus not on the nature of the tortious conduct, but on whether the birth of a healthy child is a compensable injury and whether child-raising costs are too speculative or contrary to public policy. *See generally* David Kerrane, *Part Eight: Parenting: Damages for Wrongful Pregnancy*, 11 J. Contemp. Legal Issues 467 (Nov. 2000) (discussing the treatment of wrongful conception cases in various state courts); Podewils, *supra* (same). Rather than relying on out-of-state cases, which we do not find helpful in an area of law where our precedent has already chosen a different course, the question of duty is best answered by resorting to general principles, including the nature of the doctor's tortious conduct, and our medical negligence jury instructions. "The . . . scope of a defendant's duty of care is a legal question that depends on the nature of the . . . activity in question, the parties' general relationship to the activity, and public policy considerations." *Edward C. v. City of Albuquerque*, 2010-NMSC-043, ¶ 14, 148 N.M. 646, 241 P.3d 1086. The question of policy is "answered by reference to legal precedent, statutes, and other principles of law." *Id.* ¶ 18. We turn once again to *Mendez*.

**{24}** In *Mendez*, we identified two related injuries suffered by the parents. 111 N.M. at 345, 805 P.2d at 612. The first was an injury to the parental "interest in the financial security of their family." *Id.* The second was an injury to "the parents' interest in limiting the size of their family." *Id.* The two may often overlap. An injury to the parental interest

---

[1]A more controversial cause of action is wrongful life, which is a negligence claim brought by a disabled child or that child's representative "for the harm of being born deformed." Keeton, *supra* § 55, at 370. "By and large, the child's wrongful life action mirrors that of the parents' wrongful birth claim, with one major exception: it generally is rejected by the courts." Donald L. DeVries, Jr., and Alan M. Rifkin, *Wrongful Life, Wrongful Birth, and Wrongful Pregnancy: Judicial Divergence in the Birth-Related Torts*, 20 Forum 207 (1985).

in financial security occurs when parents are forced to take on one of life's most significant financial burdens, raising a healthy child, without an opportunity to make an informed decision on the matter. Judge Alarid recognized this principle in *Mendez*, when, speaking for the Court of Appeals, he observed that "children need to be fed, clothed, housed, educated, and provided with medical care and other necessities. [Many] people . . . decide whether or not to become parents, or how many children to have, based in part on their financial resources." 111 N.M. at 352, 805 P.2d at 619. Similarly, an injury to the parental interest in limiting the size of one's family occurs when parents are deprived of an opportunity to make an informed, family-planning decision. *Id.* at 612-13, 805 P.2d at 345-46. The notion of a compensable injury flowing from a lack of medical information was critical to the Court of Appeals majority opinion in *Mendez*, which our Court included as an appendix and took great pains to adopt. 111 N.M. at 338, 805 P.2d at 605 ("On the merits, we find ourselves in substantial agreement with Judge Alarid's opinion . . . .").

{25}     The Court of Appeals opinion, again specifically embraced by this Court in *Mendez,* also discussed several medical negligence jury instructions. 111 N.M. at 349, 805 P.2d at 616. These instructions help to place wrongful conception within the larger universe of medical negligence. The Court described a doctor's general duty as a duty "to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified doctors in the same field of medicine practicing under similar circumstances." *Id.* at 349, 805 P.2d at 616 (citing UJI 13-1101 NMRA). The Court then noted that this same duty includes "a duty to provide the patient with certain information." *Id.* (citing UJI 13-1104(B) NMRA). The Court also stated that "[a] doctor who breaches this duty is liable for the harm that results to the patient if a reasonably prudent person would have acted upon the information to avoid the harm," making reference to our current instruction. *Id.* at 349, 805 P.2d at 616 (citing UJI 13-1116(B) NMRA).

{26}     These jury instructions relied upon in *Mendez* are relevant only in failure-to-inform cases. These specific jury instructions, which were cited with approval by our Court of Appeals in *Mendez,* support a conclusion that the duty owed by a doctor in a wrongful conception case is the duty to inform following an unsuccessful sterilization procedure. 111 N.M. at 347, 805 P.2d at 614 (Ransom J., specially concurring) ("Mrs. Mendez was injured the moment the doctor reached his duty to exercise required care and left her with an unligated tube in the sterilization operation, and she was further injured when he failed to inform her of the unsuccessful outcome.").

{27}     In describing the differences between prenatal medical negligence, wrongful birth, and wrongful conception, we observe that a doctor may owe multiple duties of care when treating a particular patient. For example, a doctor owes a general duty to provide competent care in treating a patient's medical condition. *See, e.g., Mireles v. Broderick*, 117 N.M. 445, 447, 872 P.2d 863, 865 (1994) (patient alleged that an anesthesiologist's negligent care during surgery caused nerve damage in her arm). In the pregnancy and childbirth context, this duty might include competently delivering a baby or performing a sterilization procedure. A doctor may also owe the same patient a duty to properly diagnose his relevant

8

medical conditions. *See, e.g., Gonzales v. Sansoy*, 102 N.M. 136, 137, 692 P.2d 522, 523 (1984) (patient alleged that a doctor failed to make a timely diagnosis of appendicitis). In the pregnancy and childbirth context, this duty to diagnose might include recognizing certain abnormalities in the fetus or determining whether a sterilization procedure was successfully performed. At the same time, a doctor may owe yet another duty to inform the patient of any pertinent medical information. *See Alberts v. Schultz*, 1999-NMSC-015, ¶ 17, 126 N.M. 807, 975 P.2d 1279 (noting that failure to inform is a "traditional theor[y] of recovery in New Mexico tort law"). This duty would certainly include an obligation to inform a patient that a sterilization procedure was unsuccessful, regardless of the cause, when the doctor reasonably knows or should know the results of a failed procedure. These various duties are not mutually exclusive, and depending on the context of the treatment sought, they may exist concurrently.

**{28}**    As we previously stated, New Mexico remains one of very few jurisdictions to permit complete recovery for the costs of raising a child to the age of majority in a wrongful conception case. Because child-rearing costs will normally far exceed other damages associated with a failed sterilization procedure, such as the costs of a second procedure and pain and suffering, courts should take great care when shifting the full weight of child-rearing expenses onto someone other than the parents. As a matter of sound policy, we think that the extraordinary damages of raising a child to the age of majority should be reserved for extraordinary cases like *Mendez*.

**{29}**    *Mendez* helps explain why this extraordinary remedy should only be available in duty-to-inform cases. In *Mendez*, the future costs of raising the unexpected child were necessarily going to fall on either the doctor or the parents. Between the negligent doctor who failed to disclose information about the unsuccessful sterilization procedure, and the unsuspecting parents who mistakenly believed they were no longer fertile, it was fair to require the doctor to pay for the subsequent pregnancy and any children resulting from that pregnancy. It was the doctor in *Mendez*, not the patient, who controlled the relevant medical information. By conforming his conduct to the relevant standard of care and fulfilling his duty to inform, the doctor in *Mendez* could have empowered the parents to take whatever measures they deemed appropriate to avoid pregnancy. It was the doctor's failure to do so that placed the parents in a position they could not be reasonably expected to control. Following this reasoning, we think the *Mendez* court intended to define the duty, though somewhat obscured, to include an obligation of notice. Conversely, if the doctor had provided notice to Mr. and Mrs. Mendez, we believe the Court would not have authorized the recovery of future, child-rearing costs.

**{30}**    Turning to the present case, Mrs. Provencio, unlike Mrs. Mendez, was aware that she remained fertile well before conceiving her next child, whether the source of that knowledge was Dr. Wenrich's ambiguous warning at the first post-operative conference or the results of the later-completed HSG test. In contrast to *Mendez*, Mr. and Mrs. Provencio possessed information that they could have used to avoid conception, assuming this was their goal. As a matter of sound policy, we believe that shifting the costs of raising Plaintiffs' fifth child

9

onto Dr. Wenrich is not commensurate with the duty that he breached nor with the harm that such a breach could have caused.

{31}   One particular hypothetical illustrates the soundness of this policy. If we were to allow *Mendez*-type recovery when parents *are* aware of their continued fertility, then a jury could award child-raising costs not only for the resulting child, but for all children born thereafter. Theoretically, a doctor's liability for a poorly-performed sterilization procedure could continue for the reproductive life of that patient, irrespective of whether that patient knew or should have known of her continued fertility, and irrespective of whether the doctor's post-surgical conduct had deprived that patient of a reasonable opportunity to avoid conception.

{32}   This result would be absurd and unjust. It would also invite unnecessary confusion, since the jury's attention would not be directed towards a doctor's post-surgical conduct and whether these actions deprived the parents of the opportunity to make an informed choice about pursuing additional children. Under Plaintiffs' theory, doctors would have no incentive to inform their patients about the results of a failed procedure since providing notice would not terminate liability in a future lawsuit for medical negligence based on the failed surgery. As a matter of policy, our rulings should encourage doctors to act responsibly and notify their patients about surgical results.

{33}   Accordingly, we hold that, following a failed sterilization procedure, damages related to an additional pregnancy, along with the costs of raising any subsequent children to the age of majority, are only available when plaintiffs can prove a breach of the duty to inform. In so doing, we reject the position advocated by the Court of Appeals. We find that damages relating solely to a negligently performed sterilization are those that would normally flow from a failed surgery, such as the cost of a second sterilization procedure, any physical or emotional harm that may result from the initial or subsequent sterilization, lost wages, the reasonable costs of birth control until a second procedure is feasible, and so forth.

{34}   Because the timeliness and adequacy of a doctor's warning are questions of fact that go to the element of breach, we see no reason to discuss in any detail the components of a successful warning following a failed sterilization procedure. *See Herrera*, 2003-NMSC-018, ¶ 33 ("The finder of fact must determine whether Defendant breached the duty of ordinary care . . . ."). Each case will contain its own unique set of circumstances, and our case law commits this important issue to the jury. *See id.* (noting that the issue of whether a specific duty has been breached "'is a factual determination or, perhaps, a mixed determination of law and fact, involving as it does the application of precepts of duty to the historical facts as found by the fact finder'" (quoting *Bober v. N.M. State Fair*, 111 N.M. 644, 650, 808 P.2d 614, 620 (1991))). We note, however, that the duty to inform requires doctors, at a minimum, to provide patients with adequate and timely information about the failed sterilization procedure and the patient's continued fertility. *See* UJI 13-1104(B)-(C); 13-1116(B). Any successful warning must include information that is objectively understandable, delivered in a manner that is reasonably likely to convey the desired

10

information to the patient in a meaningful way, keeping in mind that most patients are not medically trained and need help understanding the full ramifications of professional jargon .

**{35}**     In the current case, we can easily resolve the notice question. Despite our misgivings about the adequacy of Defendant's post-surgical communications to Mrs. Provencio, the fact remains that Plaintiff understood she was still fertile. She admitted as much at trial; there is no dispute on this question. The nature of Mrs. Provencio's admission is such that neither she nor her husband could have suffered the informational injury that lies at the heart of a claim for wrongful conception.     Accordingly, the trial court was correct in granting Defendant's motion for judgment as a matter of law. *See Torres v. El Paso Elec. Co.*, 1999-NMSC-029, ¶ 26, 127 N.M. 729, 987 P.2d 386, *overruled on other grounds by Herrera*, 2003-NMSC-018.

**CONCLUSION**

**{36}**     We reverse the Court of Appeals.

**{37}     IT IS SO ORDERED**.

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *Provencio v. Wenrich*, Docket No. 32,344**

| | |
|---|---|
| **NG** | **NEGLIGENCE** |
| NG-DU | Duty |
| NG-PI | Personal Injury |
| NG-SC | Standard of Care |
| | |
| **RE** | **REMEDIES** |

RE-CD     Compensatory Damages

**TR**     **TORTS**
TR-FA     Failure to Give
TR-MM    Medical Malpractice
TR-WB    Wrongful Birth or Pregnancy