**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2013-NMCA-087**

**Filing Date: June 4, 2013**

**Docket No. 30,307**

**MICHAEL SALOPEK,**

**Plaintiff-Appellee/Cross-Appellant,**

**v.**

**DAVID J. FRIEDMAN, M.D.,**

**Defendant-Appellant/Cross-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Jerald A. Valentine, District Judge**

The Perrin Law Firm
Doug Perrin
Santa Fe, NM

for Appellee

Kemp Smith LLP
CaraLyn Banks
Las Cruces, NM

for Appellant

**OPINION**

**KENNEDY, Chief Judge.**

**{1}** David J. Friedman, M.D. (Defendant) appeals from a $600,000 judgment against him for medical malpractice on three grounds: (1) the district court failed to properly instruct the jury on the scope of Defendant's duty to Michael Salopek (Plaintiff), (2) the district court gave incorrect "eggshell plaintiff" damages instructions, and (3) the district court erred in failing to order a new trial or remittitur. Plaintiff cross-appeals, contending that the statutory cap on damages in Section 41-5-6 of the Medical Malpractice Act (Act), NMSA 1978, §§ 41-5-1 to -29 (1976, as amended through 2008), is unconstitutional. We affirm.

1

# I.    BACKGROUND

{2}    Plaintiff has familial adenomatous polyposis (polyposis), which is an inherited disorder characterized by the development of numerous polyps in the colon, which readily leads to colon cancer.  Due to this condition, Plaintiff biannually underwent colonoscopies to remove polyps and evaluate the progression of his condition.  On February 16, 2005, Plaintiff returned home from a routine colonoscopy with increasingly sharp abdominal pain and a fever.  The following day Plaintiff went to the emergency room where he was attended to by Defendant, who, after evaluating the results of a CAT scan, stated that there appeared to be a perforation in Plaintiff's colon.  The perforation appeared to have been caused by the colonoscopist puncturing Plaintiff's colon while removing a polyp with hot forceps during his colonoscopy.

{3}    On February 17, 2005, to find and mend the perforation in Plaintiff's colon, Defendant performed a laparotomy, an exploratory abdominal surgery.  Defendant "anticipated that if found, the perforation[] could be closed with a suture[.]"  Defendant did not locate the perforation at this juncture.  Evidence indicated that this failure occurred because Defendant did not pressurize the colon with air during the laparotomy, a procedure which would have revealed the perforation.  Testimony at trial established that a well-qualified surgeon, practicing under similar circumstances, would have pressurized the colon to locate the perforation.  Eleven days after this failed attempt to locate the perforation, Defendant again operated on Plaintiff to find and fix the perforation.  By this time, the perforation had enlarged because the injured colon tissue began to disintegrate.  During this second surgery, Defendant used dye to pressurize the colon and locate the perforation.  Defendant then removed the part of the colon where the perforation was located and created a colostomy to allow the colon to heal.  The colostomy redirected Plaintiff's colon through his abdominal wall, so that stool would drain out of his body through his abdomen and into a colostomy bag that adhered to his skin.

{4}    Shortly thereafter, Plaintiff terminated his doctor-patient relationship with Defendant.  Plaintiff sought treatment from Dr. William Abbott to perform a take-down of the colostomy, which would reconnect the severed parts of his intestines.  Because of Plaintiff's polyposis condition, performing a colostomy take-down that reattached his colon created additional concerns for his health.  Due to these additional concerns, Plaintiff chose to have a restorative proctocolectomy that would remove the colon and attach the small intestine to the anus.  Plaintiff suffered complications from the restorative proctocolectomy and, ultimately, had to have thirteen surgeries in total.  Due to complications, Plaintiff's small intestine was not successfully permanently connected to his anus.  As a result, his small intestine was yet again rerouted through his abdominal wall, so that waste could drain from his body through his abdominal wall into an ileostomy bag attached to his abdomen.  At the time of trial, Plaintiff was still in this condition and stated that he did not anticipate living without an ileostomy bag in the future.

{5}    Plaintiff sued Defendant for malpractice, claiming that Defendant was negligent in

failing to use the proper techniques and find the perforation during the initial laparotomy. The jury found Defendant negligent and awarded Plaintiff $1,000,000. The district court reduced the award to $600,000, pursuant to the cap on damages contained in Section 41-5-6 of the Act. These appeals followed.

## II. DISCUSSION

### A. The District Court Properly Denied Defendant's Motion Regarding Duty

{6} Defendant argues that the district court erred in denying his motion for judgment as a matter of law. Defendant contends that, by denying his motion, the district court "expanded the duty of physicians beyond that recognized under New Mexico law."

> [D]uty . . . is for the court alone to define. Before the jury can resolve any factual matter, . . . the court must first frame the relevant law. In a negligence action, this means the court must first find an actionable duty of care and then define the nature and scope of that duty.

*Provencio v. Wenrich*, 2011-NMSC-036, ¶ 16, 150 N.M. 457, 261 P.3d 1089.

{7} It is well established that "a doctor owes a general duty to provide competent care in treating a patient's medical condition." *Id.* ¶ 27. The duty of care required of a doctor to a patient is set forth in UJI 13-1101 NMRA, which was applied at trial in this case and states:

> In [treating, operating upon, making a diagnosis of, or caring for] a patient, [the doctor] is under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified [doctors] . . . practicing under similar circumstances, giving due consideration to the locality involved.

{8} As Defendant argues, we reference "the specific circumstances actually presented" to determine whether a duty exists with reference to a foreseeable plaintiff with foreseeable harm. *Romero v. Giant Stop-N-Go of N.M., Inc.*, 2009-NMCA-059, ¶ 9, 146 N.M. 520, 212 P.3d 408. In the context of duty, "[f]oreseeability is what one might objectively and reasonably expect, not merely what might conceivably occur." *Johnstone v. City of Albuquerque*, 2006-NMCA-119, ¶ 8, 140 N.M. 596, 145 P.3d 76 (internal quotation marks and citation omitted); *see Chavez v. Desert Eagle Distrib. Co. of N.M., LLC*, 2007-NMCA-018, ¶ 17, 141 N.M. 116, 151 P.3d 77 ("The risk must be actual and perceptible, not speculative." (internal quotation marks and citation omitted)). Thus, we frame the question of duty in this case to be whether a well-qualified doctor in New Mexico, who knows his patient likely has a punctured colon and fails to pressurize his patient's colon during a laparotomy, should foresee that he would fail to find the perforation during the laparotomy and that complications related to a corrective procedure would arise as a result

3

of this failure.

**{9}** Defendant argues that "[t]here is no basis to support the [d]istrict [c]ourt's decision that Defendant owed a duty to Plaintiff related to prospective elective procedures given the circumstances present in this case." Defendant explains that he "could not objectively and reasonably expect that his purported failure to find a perforation in Plaintiff's colon during surgery . . . [would] result in Plaintiff suffering complications [from a later] elective procedure." Defendant concludes that he had "no duty [to Plaintiff for Plaintiff's later complications] given his inability to control the subsequent treatment provided to Plaintiff . . . after the [doctor-patient relationship] was terminated." Defendant argues that he "was therefore not liable for Plaintiff's decision to have the [restorative proctocolectomy] procedure in November 2005 or the resulting complications from that procedure."

**{10}** We disagree with Defendant and conclude that he should have foreseen that Plaintiff would suffer these particular harms when Defendant failed to pressurize Plaintiff's colon during the laparotomy. At trial, expert testimony indicated that Defendant would have discovered the perforation during the first surgery if he had pressurized the colon. In addition, evidence demonstrated that if the perforation was located in the first surgery, Defendant would have been able to mend it with sutures. Because Defendant waited eleven days, the injured colon tissue began to disintegrate, and the affected part of the colon now required removal rather than a few stitches. In addition, Defendant knew Plaintiff had pre-existing hereditary polyposis and that Plaintiff would require additional surgery to take down the colostomy that Defendant unnecessarily created. We conclude that removal of a section of Plaintiff's colon, a colostomy, and additional surgery were foreseeable harms that Plaintiff would suffer when Defendant did not pressurize the colon and, thereby, failed to locate the puncture during the first surgery.

**{11}** After the colostomy, Plaintiff had several options, including a take-down of the colostomy and reattaching of the colon, or a restorative proctocolectomy (removing the colon and attaching the small intestine to the anus). The heart of Defendant's argument is that the restorative proctocolectomy was an elective procedure unrelated to the colostomy and that he could not expect complications to occur during the restorative proctocolectomy due to Plaintiff's anatomy. We disagree and conclude that the restorative proctocolectomy was related to the colostomy, in that it was among several reasonable options presented to Plaintiff to reverse the colostomy and restore Plaintiff's bowels to a more normal function. Plaintiff's expert, a physician and surgeon, testified that it was foreseeable that a restorative proctocolectomy would be an option for Plaintiff following a colostomy because of his polyposis condition. If Defendant had pressurized the colon during the first surgery and discovered the perforation, Plaintiff would not have been prematurely presented with the decision of whether to have a proctocolectomy.

**{12}** Both Plaintiff and Dr. Abbott appeared to believe that the colostomy take-down would not have been a good solution, given that Plaintiff's polyposis condition would require that he have a colonoscopy every six months, and he had already suffered a

4

punctured colon from a colonoscopy, which caused Plaintiff grave apprehension about ever having another one. A corrective procedure, as well as complications from that surgery, which are not the result of another doctor's negligence, were foreseeable outcomes of a colostomy for Plaintiff. Furthermore, Plaintiff was not required to choose a colostomy take-down and reattachment of the colon over the proctocolectomy simply because it might have had the potential to limit Defendant's liability.

**{13}** We conclude that simply by operating on Plaintiff, Defendant had a duty to act as a reasonably well-qualified doctor during the surgery. Evidence established that a reasonably well-qualified doctor would have pressurized the colon to locate the perforation. A reasonably well-qualified doctor would objectively and reasonably expect that his failure to do so would result in a patient with polyposis undergoing a colostomy and, subsequently, a restorative proctocolectomy. This doctor would also expect the patient to experience any of the array of possible complications associated with these procedures.

**{14}** In addition, we are unpersuaded by Defendant's argument that we should conclude that there is no duty because this case is like *Estate of Haar v. Ulwelling*, 2007-NMCA-032, 141 N.M. 252, 154 P.3d 67. In *Estate of Haar*, this Court held that the defendant psychiatrist did not owe a duty of care to a potentially suicidal patient after the patient terminated the doctor-patient relationship with the defendant and started a new doctor-patient relationship with another physician. *Id*. ¶¶ 25-29. Defendant's reliance on this case is misplaced. In *Estate of Haar*, the alleged negligent acts, which included the doctor's failure to "affirmatively monitor [the patient's] medication, enhance [the patient's] compliance with treatment, and schedule follow-up appointments[,]" all occurred after the patient terminated the relationship with the doctor. *Id*. ¶ 25. There, we concluded that after the patient made it clear that he no longer wanted a doctor-patient relationship with the defendant, "it is unreasonable to place upon [the d]efendant a requirement that he have imposed his views or treatment recommendations on [the patient] or [the patient's new treating physicians] for the purpose of guarding against [the patient's] suicide." *Id*. ¶ 28. Our decision in *Estate of Haar* was clearly premised upon the fact that the alleged negligent act occurred after the doctor-patient relationship ended. *Estate of Haar* is inapplicable here because, in this case, the negligent act occurred prior to the termination of the doctor-patient relationship.

**{15}** We conclude that Defendant had a duty to act as a reasonably well-qualified doctor toward Plaintiff during the surgery, to use all of the proper procedures, and to protect Plaintiff against unnecessary complications. All injuries that followed were objectively and reasonably foreseeable. We thus affirm the district court's denial of Defendant's motion for judgment as a matter of law.

**B.     The Jury Instruction About Damages Was Proper**

**{16}** "We review jury instructions de novo to determine whether they correctly state the law and are supported by the evidence introduced at trial." *Benavidez v. City of Gallup*, 2007-NMSC-026, ¶ 19, 141 N.M. 808, 161 P.3d 853 (internal quotation marks and citations

5

omitted). "A party is entitled to instructions on all of his or her correct legal theories of the case if there is evidence in the record to support the theories." *Id.* "It is not error to deny requested instructions when the instructions given adequately cover the law to be applied." *Kirk Co. v. Ashcraft*, 101 N.M. 462, 466, 684 P.2d 1127, 1131 (1984). "A civil case will not be reversed due to error in jury instructions unless the result is fundamentally unjust." *McNeill v. Burlington Res. Oil & Gas Co.*, 2007-NMCA-024, ¶ 19, 141 N.M. 212, 153 P.3d 46, *aff'd*, 2008-NMSC-022, 143 N.M. 740, 182 P.3d 121.

**{17}** At trial, Plaintiff submitted UJI 13-1802 NMRA to the district court, seeking recovery of damages under two theories that Defendant's actions (1) aggravated Plaintiff's pre-existing condition; or (2) injured Plaintiff, who may have been unusually susceptible to injury. The district court concluded that Defendant's actions did not aggravate Plaintiff's pre-existing condition and, consequently, denied the instruction on aggravation of a pre-existing condition. Yet, the district court concluded that the latter instruction, also known as, the "eggshell plaintiff" instruction, was supported by evidence and the theory of Plaintiff's case and, thus, presented it to the jury. *See* UJI 13-1802 cmt. (describing the jury instruction as the "eggshell plaintiff" instruction). The instruction stated:

> Whether any of these elements of damages have been proved by the evidence is for you to determine. However, damages are to be measured without regard to the fact Plaintiff may have been unusually susceptible to injury or likely to be harmed. . . . Defendant is said to "take the Plaintiff as he finds him," meaning that . . . Defendant, if liable, is responsible for all elements of damages caused by . . . Defendant's conduct even if some of . . . Plaintiff's injury arose because . . . Plaintiff was unusually susceptible to being injured.

**{18}** Defendant makes two arguments in contending that the district court erred in permitting the eggshell plaintiff instruction to be submitted to the jury. First, Defendant contends that Plaintiff does not fit the requirements of an "eggshell plaintiff." Defendant argues that either the entire UJI 13-1802 should have been given, or no instruction should have been given on the matter at all. In making this argument, Defendant states that "[s]pecifically, the evidence presented at trial established that Plaintiff's injuries, i.e., pain and suffering, loss of enjoyment of life etc., resulted from the effect of his anatomical abnormality (deep narrow pelvis) on Dr. Abbott's ability to successful[ly] perform the elective procedure on November 15, 2005 to treat Plaintiff's inherited disorder."

**{19}** Second, Defendant argues in the alternative that error occurred in submitting the instruction without "a reference to Defendant only being liable for the worsening of Plaintiff's cond[ition] and not for elements of damages attributed to Plaintiff's . . . polyposis." Referring to UJI 13-1802, Defendant asserts:

> While the jury instruction on [damages for an] "eggshell" plaintiff describes the extent of the damages that can be imposed on a defendant, the instruction

does not relieve a plaintiff of the burden of establishing that the underlying condition was exacerbated by the negligence of the defendant . . . as opposed to the underlying condition.

Defendant contends that the court's failure to do this permitted the jury to impose liability on him for damages that he did not cause.

**{20}** We disagree with Defendant and conclude that the jury was properly instructed about Plaintiff's status as an "eggshell plaintiff." The jury instruction defines the "eggshell plaintiff" as a person "unusually susceptible to injury or likely to be harmed." UJI 13-1802. The defendant must "take the plaintiff as he finds [him]" and, therefore, "is responsible for all elements of damages caused by the defendant's conduct even if some of the plaintiff's injury arose because the plaintiff was unusually susceptible to being injured." *Id.* This means that "the wrongdoer is liable for the proximate results of that injury, although the consequences are more serious than they would have been, had the injured person been in perfect health." *Rowe v. Munye*, 702 N.W.2d 729, 741 (Minn. 2005) (internal quotation marks and citation omitted). "The eggshell plaintiff rule . . . applies only when the pain or disability arguably caused by another condition arises *after* the injury caused by the defendant's fault has lighted up or exacerbated the prior condition." *Sleeth v. Louvar*, 659 N.W.2d 210, 212 (Iowa 2003); *see Avery v. Ward*, 934 S.W.2d 516, 520 (Ark. 1996) ("[A]n 'eggshell plaintiff' . . . is[] one who was susceptible to enhanced injury by virtue of an existing condition."); *Iazzetta v. Nevas*, 939 A.2d 617, 619 (Conn. App. Ct. 2008) (explaining the meaning of an "eggshell plaintiff").

**{21}** In this case, Plaintiff had dormant conditions that made him more susceptible to injuries caused by Defendant's failure to find the perforation during the first surgery. Namely, Plaintiff's polyposis condition complicated his recovery from the colostomy because the polyposis necessitated a restorative proctocolectomy in order to undo the colostomy created by Defendant. Plaintiff's anatomical abnormalities made him more susceptible to complications with regard to the restorative proctocolectomy. The pain and disablement that occurred as a result of the restorative proctocolectomy can fairly be viewed as a proximate result of Defendant's failure to find the perforation during the first surgery. The consequences of Defendant's negligence are certainly more serious than they would have been with someone who did not possess these conditions. Yet, the additive effect of Plaintiff's condition does not lessen Defendant's liability for his conduct, as the jury was instructed under UJI 13-1802.

**{22}** To the extent that Defendant argues that the eggshell plaintiff instruction cannot be given without the aggravation instruction, we conclude that aggravation and eggshell instructions are two different theories of liability and can be given separately or together, in the alternative, as long as each is supported by a factual basis. *See Sleeth*, 659 N.W.2d at 212-16 (determining whether the trial court properly advised on a theory of aggravation of the plaintiff's pre-existing condition as well as the eggshell plaintiff theory); *Waits v. United Fire & Cas. Co.*, 572 N.W.2d 565, 578 (Iowa 1997) (stating that both instructions can be

7

given because the trial court determined that a factual basis supported each). The Iowa Supreme Court explained:

> Whether the eggshell plaintiff rule applies or the aggravation rule applies depends in the first instance on when the pain or disability for which compensation is sought arose. Where the prior condition resulted in pain or disability *before* the second injury, the tortfeasor is liable only for the *additional* pain and disability arising after the second injury. With respect to any pain or disability arising *after* the second injury, the tortfeasor is fully responsible, even though that pain and disability is greater than the injured person would have suffered in the absence of the prior condition.

*Id.* at 577-78.

**{23}** The case before us exemplifies a situation where the eggshell plaintiff instruction, but not the aggravation instruction, is applicable. Plaintiff had pre-existing conditions—polyposis and a deep, narrow pelvis. The specific pain and disability for which Plaintiff sought redress here did not exist before Defendant's negligent action, despite the fact that Plaintiff had these conditions. Only after Defendant injured Plaintiff, did Plaintiff have to endure a proctocolectomy and complications from that surgery. No pre-existing conditions were aggravated, but Plaintiff's pre-existing conditions amplified the effect of Defendant's actions. The pain and disability occurred after Defendant's actions and not before.

**{24}** At the heart of Defendant's second argument is the contention that the jury should distinguish the damages caused by him from the damages caused by Plaintiff's underlying conditions. Yet, UJI 13-1802 makes it clear that, although the condition may contribute to the injury, as long as Defendant's conduct can be said to have proximately caused the injury, he will be held liable for the resulting injuries. The eggshell plaintiff theory of liability prevents the defendant from escaping liability when his conduct precipitates a more severe injury than a person of normal health would typically suffer. *See Gasiorowski v. Hose*, 897 P.2d 678, 680 (Ariz. Ct. App. 1994) (holding that the "'eggshell plaintiff' instruction [states] that an accident victim's predisposing susceptibility does not relieve a negligent actor of responsibility for whatever injuries his negligence precipitates"); *Hoffman v. Schafer*, 815 P.2d 971, 972-73 (Colo. App. 1991) (stating that, under the eggshell plaintiff rule, "the jury [is] not to refuse to award or to reduce the amount of damages it awarded [the] plaintiff because of 'any physical frailties of the plaintiff that may have made her more susceptible to injury, disability, or impairment'"); *City of Jackson v. Estate of Stewart ex rel. Womack*, 2003-CA-01413-SCT, 908 So. 2d 703, 715 (Miss. 2005) ("It simply provides that plaintiffs who are far more susceptible to a particular harm than the average person may nonetheless recover their full damages without reduction."). Here, there is evidence indicating that both Defendant's conduct and the underlying condition resulted in the injuries and not one or the other exclusively. Thus, this case fits the requirements of the eggshell plaintiff theory, and we do not apportion damages by attempting to distinguish between how much injury the

condition caused, and how much injury Defendant caused, as the injury would not have occurred without his negligence.

**{25}** In support of his argument, Defendant states that this Court has held that "a defendant was only liable for the damages the defendant caused, regardless of the plaintiff's physical conditioning or lack thereof." *See Thomas v. Henson*, 102 N.M. 417, 424, 696 P.2d 1010, 1017 (Ct. App. 1984), *aff'd in part, rev'd in part on other grounds by* 102 N.M. 326, 695 P.2d 476 (1984). Defendant misapplies our holding in *Thomas*. In *Thomas*, passengers, who were injured in an automobile accident, sued the defendant driver. *Id*. at 419, 696 P.2d at 1012. The passengers were not wearing their seat belts, and the defendant argued that their damages should be reduced because of their failure to wear seat belts. *Id*. at 419-20, 696 P.2d 1012-13. There, we held that, "as part of the continuing duty to exercise reasonable care for his or her own safety, an occupant of an automobile has a duty to fasten an available seat belt or similar safety restraint device unless the circumstances dictate otherwise." *Id*. at 424, 696 P.2d at 1017. We concluded that such damages arising out of the plaintiff's failure to wear a seat belt "may not be recovered from a defendant because such damages resulted from [the] plaintiff's conduct." *Id*. We emphasized that "a defendant will still take the victim as he finds him and be liable for the damages the defendant causes. Where, however, damages are caused by the plaintiff's failure to care for his own safety (not his physical condition), [the] plaintiff may not recover those damages." *Id*. *Thomas* does not support Defendant's argument that he is not liable for Plaintiff's resulting injuries. Rather, it reiterates our rationale for affirming the district court. Defendant must take Plaintiff as he found him with his hereditary condition and anatomical abnormalities. Unlike the plaintiffs in *Thomas*, no evidence in this case indicates that Plaintiff failed to care for his own safety, or that the pre-existing condition caused his damages. As explained above, the jury determined that the damages resulted from Defendant's negligent act.

**{26}** Furthermore, to the extent that Defendant argues that the proctocolectomy was an elective procedure, we agree that Plaintiff can only recover for the injuries caused by Defendant. At trial, the district court properly instructed the jury that the injuries must be caused by Defendant's negligence and not by another source. These instructions fully inform the jury that Defendant can only be liable for the injuries he actually caused Plaintiff. We read jury instructions as a whole and, when they fairly present the issues and the applicable law in light of the evidence presented at trial, they are sufficient. *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 16, 125 N.M. 748, 965 P.2d 332. The jury instructions given sufficiently allowed the jury to differentiate between the harm caused by Defendant and the harm caused by any other sources.

**{27}** In arguing that the proctocolectomy was an elective procedure, Defendant seems to indicate that this was an unnecessary procedure chosen by Plaintiff unrelated to the colostomy. As explained above, Plaintiff had to make a choice of how to deal with the colostomy, and the evidence shows that a proctocolectomy was a reasonable choice given the options facing him. To the extent that Defendant argues the proctocolectomy would have inevitably occurred due to Plaintiff's polyposis, we remind Defendant that the only reason

why Plaintiff underwent such a drastic surgery when he did was because of Defendant's negligent conduct. "A tortfeasor is liable for damages suffered by an 'eggshell' plaintiff which are a natural consequence of the accident, even though the plaintiff may inevitably suffer similar injuries from a pre-existing condition unrelated to the accident." *Sumpter v. City of Moulton*, 519 N.W.2d 427, 434 (Iowa Ct. App. 1994). Even if Plaintiff *may* have needed the procedure in the future, he had to undergo the procedure prematurely because of Defendant's negligent act. Furthermore, it remains uncertain whether Plaintiff would have needed the restorative proctocolectomy due to the progression of his polyposis in the future as that set of events never came to fruition.

**{28}** In conclusion, the district court properly advised the jury on the eggshell plaintiff rule. Defendant must take Plaintiff as he found him with his hereditary condition and anatomical abnormalities and is liable in full for all injuries he proximately caused.

**C.** **The District Court Did Not Err When It Refused to Reduce the Amount of the Jury Verdict or Grant a New Trial**

**{29}** When the jury returned a $1,000,000 judgment against Defendant, he moved for a new trial or remittitur. The district court denied the motion. Defendant contends that the district court erred by refusing to grant either remedy. "The applicable standard in reviewing the denial of a motion for a new trial or remittitur is abuse of discretion." *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 13, 146 N.M. 853, 215 P.3d 791. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. "When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion." *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted). "Where the court's discretion is fact-based, we must look at the facts relied on by the trial court as a basis for the exercise of its discretion, to determine if these facts are supported by substantial evidence." *Apodaca v. AAA Gas Co.*, 2003-NMCA-085, ¶ 60, 134 N.M. 77, 73 P.3d 215 (internal quotation marks and citation omitted).

**{30}** "In determining whether a jury verdict is excessive, we do not reweigh the evidence but determine whether the verdict is excessive as a matter of law. The jury's verdict is presumed to be correct." *Ennis v. Kmart Corp.*, 2001-NMCA-068, ¶ 27, 131 N.M. 32, 33 P.3d 32. To rebut this presumption, either of the following tests must be met: "(1) whether the evidence, viewed in the light most favorable to [the] plaintiff, substantially supports the award[;] and (2) whether there is an indication of passion, prejudice, partiality, sympathy, undue influence[,] or a mistaken measure of damages on the part of the fact finder." *Sandoval*, 2009-NMCA-095, ¶ 16 (internal quotation marks and citation omitted); *Baxter v. Gannaway*, 113 N.M. 45, 48, 822 P.2d 1128, 1131 (Ct. App. 1991) ("In the absence of an unmistakable indication of passion or prejudice, a reviewing court will not set aside a jury's award of damages unless the amount of the verdict in light of the evidence indicates the jury was influenced by prejudice, passion, or other improper considerations."). We will not

disturb the verdict simply because "a jury's award is possibly larger than the court would have given." *Richardson v. Rutherford*, 109 N.M. 495, 503, 787 P.2d 414, 422 (1990) (internal quotation marks and citation omitted). "Only in extreme cases will an award of damages be found excessive." *Sandoval*, 2009-NMCA-095, ¶ 19. In this case, Defendant argues that both insufficient evidence and improper jury considerations indicate that the jury verdict was excessive.

## 1. Evidence Substantially Supports the Award

**{31}** In addressing this prong of the test, "[t]he proper approach is to examine [the p]laintiff's evidence related to damages and determine whether that evidence could justify the amount of the verdict, or determine whether the verdict amount was grossly out of proportion to the evidence of [the p]laintiff's pain and suffering." *Id.* ¶ 22. After examining the evidence, we determine whether any "disproportionality [between the evidence and the verdict] shocks our conscience." *Id.* (footnote omitted). "A jury's damages award will be upheld unless it appears that the amount awarded is so grossly out of proportion to the injury received as to shock the conscience." *Id.* ¶ 20 (internal quotation marks and citations omitted).

**{32}** Defendant first argues that there was not sufficient evidence to justify the amount of the award. Defendant's argument again centers around causation, as he contends that "Plaintiff's injury was a result of his dormant medical condition and the procedure performed on November 2005 for the treatment of his inherited disease." Defendant states that "[a]ny future pain and suffering incurred by Plaintiff resulted either from the November 2005 procedure or the progression of his inherited disease." Defendant concludes that "[g]iven the evidence regarding the cause of Plaintiff's injury, the lack of substantial evidence regarding damages, and the application of incorrect substantive law (duty and jury instruction) by the [d]istrict [c]ourt, the [d]istrict [c]ourt abused its discretion in not granting a remittitur or new [t]rial."

**{33}** At trial, the jury was instructed that, if it decided in favor of Plaintiff on the question of liability, it must then determine what amount of money would reasonably and fairly compensate Plaintiff for any of the following elements of damages:

1. Reasonable value of medical care treatment and services received which the parties have stipulated cannot exceed $165,000[];

2. Nature, extent[,] and duration of injury;

3. The pain and suffering, including, but not limited to[,] physical disfigurement, loss of enjoyment of life, between the time of the injury and present; and

4. Future pain and suffering.

11

**{34}** We conclude that, based upon the injury suffered by Plaintiff, there was sufficient evidence to support the verdict amount based on these factors. Plaintiff testified in extensive detail about the physical and emotional ramifications of his injury. While recovering after the first unsuccessful surgery, Plaintiff characterized the pain as "intense" and described himself as a "very frustrated [and] very hurting human being." Plaintiff could not walk well, was in constant pain, and had fevers. Shortly before the second surgery, Plaintiff thought that he "was losing [his] life." Immediately following the second surgery, Plaintiff had complications with his lungs that caused him great discomfort. Over the course of the twenty days that he was in the hospital for the two surgeries and recovery, Plaintiff lost fifty pounds.

**{35}** Moreover, after the second surgery, Plaintiff woke up in severe pain with a colostomy bag over an open wound through which waste would exit his body. Plaintiff stated that living with the colostomy bag changed his life, explaining that "[i]t is a whole different process of using the restroom. It poses a whole series of things you must now guard. It is quite a big change." Plaintiff explained that the colostomy bag affected how he went out in public, slept, and lived. Plaintiff testified that he no longer had any control of his bowel movements and that this would result in accidents with his colostomy bag filling up and breaking during the day. He explained that sleeping became very difficult, as he would "average about two and a half hours of straight sleep and then . . . get up to change the [colostomy] bag." He described instances of how the colostomy bag would accidentally get caught on something and rip, spilling feces wherever he might be at the time. As a result of the colostomy bag, Plaintiff's return to work on his family farm was limited. Following the surgery, he could not travel because he had issues with the colostomy bag leaking. Plaintiff still deals with these problems today, as his bowels were never restored to normal function due to complications with the restorative proctocolectomy.

**{36}** Plaintiff testified about how the colostomy affected his relationship with his wife and his teenage daughter, who was just starting high school around the time of the surgeries. The colostomy impacted Plaintiff's sexual relationship with his wife. Plaintiff stated that he has felt "so obligated to his wife for helping [him]." Due to the colostomy and his weakness from the surgery, Plaintiff had trouble taking an active role in his daughter's life, and he could not support her at her athletic events the way he used to.

**{37}** In order to take down the colostomy, Plaintiff underwent surgery from another doctor who removed the colon and attached the small intestine to the anus. This attempted proctocolectomy resulted in serious complications because scar tissue developed around his rectum and impeded the passage of waste through Plaintiff's body. He described the experience as "really septic[, a]nd it's like if you're having . . . your worst flu that you're living with every day. . . . It was very uncomfortable." Plaintiff testified that when waste was capable of passing, "it was real urgent, and I had accidents all the time." Accidents became common in bed, and he had great difficulty running to the restroom. He felt humiliated by the experience and going out in public or traveling was very difficult for him, as he would need to use the restroom at least twenty times per day. Plaintiff concluded that

12

it "was a real low point in [his] life. . . . [He] was very weak, and the pains of it were horrendous of blockage and gas, and . . . constant . . . internal problem[s]."

**{38}** After the proctocolectomy, Plaintiff suffered from an abscess as a complication of the surgery, which required doctors to insert a tube into his side to drain it. Plaintiff stated that "it was very painful having that tube stuck out of [his] abscess. And [he] was not allowed to eat. [He] had to eat through an IV." As a result, he rapidly lost weight during the three months with the tube.

**{39}** Because of the complications of the proctocolectomy, Plaintiff returned to having an ileostomy bag, so that waste could drain out through his abdominal wall into a bag attached to a stoma. Plaintiff stated that the bag was permanent and that he continued to live with the same set of problems he described with the colostomy bag. Although now he is more familiar with it, he still must take precautions to prevent injury to his stoma and to prevent bag breakage and leaks. He continues to have problems sleeping, as he must wake up in the middle of the night several times to change his bag. Plaintiff testified that he no longer can water ski, is limited when it comes to hunting or fishing, and has been forced to make many life changes. Plaintiff summarized his colostomy and surgical experience with Defendant as "traumatic," indicating that it had a lasting effect on him. He explained that "I go on vacations, and after four or five days I want to be home. I mean, I just can't explain what [twenty] days of . . . fighting for your life in the hospital, going through those processes that I went through. It's very horrifying. The recovery time was very horrifying."

**{40}** The foregoing evidence provides a clear picture of the nature, extent, and duration of Plaintiff's injury, his present and future pain and suffering, his physical disfigurement, and his loss of enjoyment of life. We hold that there is no disproportionality between the evidence in the verdict that would shock our conscience. We conclude that, in combination with his $165,000 in medical expenses, the evidence of this severe, disturbing, and far-reaching injury substantially supports the jury's $1,000,000 verdict.

**{41}** To the extent that Defendant argues that he did not cause the injury, pain, suffering, disfigurement, or loss of enjoyment of life because they were a product of complications caused by Plaintiff's polyposis and abnormally shaped pelvis, we have already addressed causation. We reiterate that the evidence substantially supports the jury's finding that Defendant caused Plaintiff's initial injury and the resulting damage. To the extent that Defendant asserts that the "objective evidence" did not support Plaintiff's assertions that he lost weight or suffered a great deal of pain, Defendant fails to provide citations to the record for this proposition. Thus, we do not address this argument. *See Santa Fe Exploration Co. v. Oil Conservation Comm'n*, 114 N.M. 103, 108, 835 P.2d 819, 824 (1992) (holding that where a party fails to cite any portion of the record to support its factual allegation, the Court need not consider its argument on appeal). We hold that substantial evidence ultimately supports the verdict.

**2.      There is No Indication of Passion, Prejudice, Partiality, Sympathy, Undue**

13

**Influence, or a Mistaken Measure of Damages on the Part of the Fact Finder**

**{42}** Second, Defendant contends that the timing surrounding the return of a verdict by the jury, coupled with the amount of the judgment, created a suspicion and impression of juror misconduct and thus tainted the verdict. In this case, jury deliberations began on August 28, 2009, at 8:30 a.m. At 12:45 p.m., the jury advised the district court that they were deadlocked six to six. The district court called the jury into open court and reiterated to the jury that they are the judges of the facts and must deliberate with each other only after impartial consideration of the evidence. At 4:55 p.m., the jury advised the court that they were still deadlocked seven to five. The district court then told the jury to "keep us advised." At 6:52 p.m., the jury advised that it was still deadlocked seven to five, although one juror was considering moving. In response, the district court noted that there was no question posed that the court could answer. At 8:35 p.m., the jury sent the following note to the judge:

> After reviewing the information on the case[,] we are no closer to reaching the required number of [ten] people to agree. Currently[,] the count stands at [seven to five] and we have been deliberating for [twelve] hours[.] At what point[,] do we stop attempting to reach a verdict that [ten] of us can agree[?] The people are tired, hungry[,] and f[r]ustrated[.] We have only changed one vote during the [twelve] hours.

The district court and the parties then agreed that the jury should be brought back into the courtroom, a mistrial declared, and the jury sent home. Shortly thereafter, the bailiff knocked on the jury room door in order to bring them back to open court, and the jury advised the bailiff that there had been a change and that they were coming to an agreement. When the court relayed this news to the parties, Defendant moved for the court to declare a mistrial and requested that the bailiff question the jury as to what caused the change. The court denied the motion. Sometime around 9:20 p.m., the jury returned to the courtroom and rendered a verdict against Defendant in the amount of $1,000,000.

**{43}** Defendant's argument with regard to passion, prejudice, partiality, sympathy, undue influence, or a mistaken measure of damages on the part of the fact finder can be broken into two contentions. First, Defendant argues that the above-stated facts indicate that the jury did not have sufficient time to reach a verdict and consider a verdict amount and, thus, the verdict was unreliable. Second, Defendant contends that the timing supports a conclusion that there was a quotient verdict. We address each in turn.

**{44}** Citing *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439 (10th Cir. 1988) (per curiam), *superceded by statute as stated in Guillory-Wuerz v. Brady*, 785 F. Supp. 889 (D. Colo. 1992), Defendant argues that this time line, "particularly beginning with the note the [c]ourt received at 8:35 p.m. . . . that the jury felt they had an agreement, was sufficient for the [d]istrict [c]ourt to arrive at a conclusion of impropriety, and grant a new trial." In *Skinner*, the plaintiff sued his employer for wrongful termination and was awarded $3,945.48 by the

jury. *Id*. at 1441-42. The plaintiff moved for a new trial because this amount was only a small fraction of the damages claimed by the plaintiff. *Id*. at 1442. The district court denied the motion, "yet thereafter awarded [the plaintiff] over $40,000[] as compensation for backpay and lost benefits." *Id*. at 1445. The Tenth Circuit Court of Appeals, in holding that the district court abused its discretion in failing to grant the plaintiff's motion for a new trial, evaluated whether the jury verdict was "the result of jury compromise[.]" *Id*. The court stated that "a damages award that is grossly inadequate, a close question of liability, and an odd chronology of jury deliberations are all indicia of a compromise verdict." *Id*. at 1445-46. The court concluded that the $3,945.48 represented only a small fraction of the damages asserted by the plaintiff and that there was no evidence in the record as to why the jury chose to calculate the damages the way it did. *Id*. at 1446. The court reasoned the pattern of jury deliberations was suspect because the jury told the court it could not reach a unanimous decision shortly before its lunch break and, within two hours after the lunch break, the jury returned its verdict. *Id*. The court held that "[t]his, coupled with the fact that the district court, by awarding substantially greater damages in its Title VII judgment, thus implicitly concluding that the jury's backpay award was inadequate, supports our conclusion that the district court's denial of [the plaintiff's] motion for new trial was an abuse of discretion." *Id*. In concluding that all three indicia were present in the case, the Tenth Circuit reversed. *Id*.

**{45}** First, *Skinner* is not binding on this Court and, more importantly, is not on point or persuasive because it engages in a juror compromise analysis not relevant to the case at bar. The reversal of the jury award in *Skinner* is based upon several factors, only one of which is the chronology of events associated with the jury verdict. Unlike *Skinner*, we are not evaluating the jury verdict in this case for a compromise verdict. No evidence supports a conclusion that the jury verdict was suspect. However, Defendant's argument is otherwise deficient. As explained above, unlike the evidence in *Skinner*, substantial evidence supports the verdict amount in this case. Moreover, the district court did not adjust the verdict for any other reason than to comply with the statutory cap on medical malpractice damages as it indicated in its order. We conclude that juror passion, prejudice, partiality, sympathy, undue influence, or a mistaken measure of damages has not been established by Defendant.

**{46}** Second, Defendant contends that the period of time between the jury's note and the interval in which they thought they had an agreement was insufficient "to reach a verdict and then subsequently consider the verdict amount." Defendant states:

> The timing supports a conclusion that the jury only had time to add the amount indicated by the individual jurist, divide by eleven, and round up. . . . [W]hen there is no time for each juror to take the opportunity to approve of, to reject, or to discuss the results, as was the case here, the verdict falls within the definition of a prohibited quotient verdict.

The method of addition and division of the jurors' individual verdicts, "by itself, is not improper and does not brand the result as a quotient verdict." *Bd. of Comm'rs of Doña Ana*

15

*Cnty. v. Gardner*, 57 N.M. 478, 490, 260 P.2d 682, 689 (1953), *superseded by statute as stated in Yates Petroleum Corp. v. Kennedy*, 108 N.M. 564, 568, 775 P.2d 1281, 1285 (1989).  Rather, a quotient verdict occurs when the jurors agree in advance "to accept one-twelfth of the aggregate amount of their several estimates as their verdict, without subsequent reconsideration."  *Gardner*, 57 N.M. at 490, 260 P.2d at 689.  In essence, Defendant contends that we can infer there was an agreement to average each juror's individual verdict without subsequent consideration based upon the fact that only forty-five minutes lapsed from the jury's note, indicating that it was deadlocked until the time it gave its verdict.[1]

**{47}**    We disagree and will not make this inference.  "Absent express evidence of such a prior agreement, the presumption of the law is that the jury behaved properly."  *Id.* at 493, 260 P.2d at 691.  Defendant cites no express evidence demonstrating that there was any impermissible agreement. Tentative inferences of a quotient verdict made by Defendant are insufficient proof to overturn a jury verdict award.  Defendant's failure to provide express evidence of an agreement is fatal to his argument.

**{48}**    We therefore cannot conclude that the verdict, which was supported by substantial evidence, was tainted by passion, prejudice, partiality, sympathy, undue influence, or a mistaken measure of damages on the part of the fact finder.  We affirm the jury's verdict.

**D.      The Cap on Medical Malpractice Damages is Constitutional**

**{49}**    Plaintiff preserved four constitutional challenges to the cap on damages in the Act. Specifically, he contends that the cap infringes on the right to a jury trial and is in violation of the separation of powers doctrine under the New Mexico Constitution.  In addition, he contends that the cap violates equal protection and substantive due process under both the New Mexico and United States Constitutions.  We begin by reiterating the long-standing presumption that acts of the Legislature are constitutional and that challenges must establish unconstitutionality beyond all reasonable doubt. *City of Albuquerque v. Jones*, 87 N.M. 486, 488, 535 P.2d 1337, 1339 (1975); *ACLU of N.M. v. City of Albuquerque*, 2006-NMCA-078, ¶ 10, 139 N.M. 761, 137 P.3d 1215.  We address each argument in turn.

**1.      The Cap Does Not Violate the Right to a Trial by Jury**

---

[1]We note that Defendant argues that less time passed between the note and consensus. Defendant contends that the jury indicated it had an agreement at 8:52 p.m. and, thus, the total amount of time that had passed was seventeen minutes. We disagree. At 8:52 p.m., the jury indicated that they were coming to an agreement, not that there was an agreement and a verdict amount decided upon.  We therefore examine Defendant's contentions about the improper verdict amount based upon the time when the jury actually gave their verdict at 9:20 p.m.

16

**{50}** The Act expressly provides that "[e]xcept for punitive damages and medical care and related benefits, the aggregate dollar amount recoverable by all persons for or arising from any injury or death to a patient as a result of malpractice shall not exceed six hundred thousand dollars ($600,000) per occurrence." Section 41-5-6(A). Plaintiff contends this cap violates his constitutional right to have a jury determine his damages under the New Mexico Constitution. We disagree. When the Legislature adopted the Act almost thirty-seven years ago in 1976, it created an entirely new statutory cause of action that was not recognized under the common law. Thus, we conclude that the Act's cap on damages does not violate the constitutional right to a jury trial protected by the New Mexico Constitution.

**{51}** Article II, Section 12 of the New Mexico Constitution provides "[t]he right to trial by jury as it has heretofore existed shall be secured to all and remain inviolate." In *State ex rel. Bliss v. Greenwood*, 63 N.M. 156, 161, 315 P.2d 223, 226 (1957), our Supreme Court explained that through Article II, Section 12,

> the Constitution continues the right to jury trial in that class of cases in which it existed either at common law *or by statute* at the time of the adoption of the Constitution . . . . And, as we view the matter, the phrase as it has heretofore existed refers to the right to jury trial as it existed in the Territory of New Mexico at the time immediately preceding the adoption of the Constitution.

*Greenwood*, 63 N.M. at 161, 315 P.2d at 226 (internal quotation marks and citations omitted). In making a determination about whether the right to trial by jury exists in a specific context, we engage in two related inquiries. First, "we must consider whether such an action fits within that 'class of cases' in which the right [to a jury trial] existed either at common law or by statute at the time of the adoption of our constitution." *State ex rel. Human Servs. Dep't v. Aguirre*, 110 N.M. 528, 529-30, 797 P.2d 317, 318-19; *see Lisanti v. Alamo Title Ins. of Tex.*, 2002-NMSC-032, ¶¶ 13-15, 132 N.M. 750, 55 P.3d 962. If we do not answer this question affirmatively, there is no right to a jury trial, and our inquiry ends. *State ex rel. Children, Youth & Families Dep't v. B.J.*, 1997-NMCA-021, ¶ 6, 123 N.M. 99, 934 P.2d 293. As noted by the court in *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249 (5th Cir. 2013), the "inviolate" guarantee of a jury trial "simply means that the jury right is protected absolutely in cases where it applies; the term does not establish what that right encompasses." *Id.* at 263. A second related inquiry is "whether the type of case calls for equitable or legal relief." *B.J.*, 1997-NMCA-021, ¶ 9; *see Aguirre*, 110 N.M. at 530, 797 P.2d at 319. Where the relief sought is essentially equitable, there is no right to a jury trial. *Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell*, 118 N.M. 470, 482, 882 P.2d 511, 523 (1994). Since we conclude that the Act creates a statutory cause of action that did not exist at common law, we do not engage in the second inquiry. *See id.* at 481-82, 882 P.2d at 522-23.

**{52}** The historical circumstances leading to passage of the Act are well documented. Ruth L. Kovnat, *Medical Malpractice Legislation in New Mexico*, 7 N.M. L. Rev. 5, 7-8 (1976-77), states that the Act was enacted

17

in response to a widely-held perception that a medical malpractice crisis existed in the state. New Mexico was not alone in this perception. In 1975 and 1976, [forty-five] states enacted some form of legislation to relieve the malpractice dilemma. The event which immediately triggered public concern in this state was the announced withdrawal, in 1975, of the Travelers Insurance Companies as the underwriter of the New Mexico Medical Society's professional liability program. The Company's withdrawal from the insurance market threatened providers of health care in New Mexico with a lack of protection against liability claims. Of at least equal importance, the withdrawal jeopardized the remedy of a patient suffering because of the negligent acts of such a health care provider even though his right to a remedy could be established employing ordinary negligence principles.

(Footnotes omitted). Thus, the stated purpose of the Act "is to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico." Section 41-5-2. Against this backdrop, our Supreme Court has declared that the Act "was enacted by the [L]egislature in order to meet an insurance crisis, to promote health care in New Mexico by providing a framework for tort liability with which the insurance industry could operate." *Wilchinsky v. Medina*, 108 N.M. 511, 516, 775 P.2d 713, 718 (1989); *see Baker v. Hedstrom*, 2012-NMCA-073, ¶¶ 22-23, 284 P.3d 400 (recognizing why the Act was adopted), *cert. granted*, 2012-NMCERT-007, 295 P.3d 600; *Roberts v. Sw. Cmty. Health Servs.*, 114 N.M. 248, 251, 837 P.2d 442, 445 (1992) (same).

**{53}**     To achieve its purposes, the Act adopted by the Legislature creates a new statutory cause of action, which did not exist when the Constitution was adopted and is not recognized under the common law. The Act creates a "malpractice claim" against a "health care provider." A "malpractice claim" is

> any cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment[,] or other claimed departure from accepted standards of health care which proximately results in injury to the patient, whether the patient's claim or cause of action sounds in tort or contract, and includes but is not limited to actions based on battery or wrongful death[.]

Section 41-5-3(C) (1977). In turn, a "health care provider" is

> a person, corporation, organization, facility[,] or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist[,] or physician's assistant[.]

18

Section 41-5-3(A). Construing this language, we have previously concluded that potential defendants under the Act include individuals and entities with which the plaintiff may not have a physician-patient relationship. *Baer v. Regents of Univ. of Cal.*, 118 N.M. 685, 689, 884 P.2d 841, 845 (Ct. App. 1994) ("[T]he statute's broad definition of potential defendants provides significant evidence of the [L]egislature's intent to impose liability beyond the context of a physician-patient relationship.").

**{54}** Before this statutory cause of action can be filed in court, a plaintiff must first present the claim to the medical review commission created by Section 41-5-14 to be reviewed. Section 41-5-15. The administrative duties of the medical review commission are handled by its director, who is an attorney "appointed by and serving at the pleasure of the [C]hief [J]ustice of the New Mexico [S]upreme [C]ourt." Section 41-5-14(E). Following a hearing conducted before a panel of the medical review commission under procedures statutorily prescribed in Section 41-5-19, the panel determines whether there is substantial evidence that malpractice occurred and whether there is a reasonable medical probability that the patient was injured thereby. Section 41-5-20. If a decision is made in favor of the plaintiff, the panel, its members, the director of the medical review commission, and the professional association concerned must assist in retaining a physician qualified in the field of medicine involved "who will consult with, assist in trial preparation[,] and testify on behalf of the patient[.]" Section 41-5-23. There is no similar statutory precondition to bringing a common law action, and the common law has no requirement for a plaintiff to be provided assistance in securing a medical expert.

**{55}** In addition to the foregoing, the Act provides its own statute of limitations for bringing a "malpractice claim." A "malpractice claim" against a "health care provider" must be filed "within three years after the date that the act of malpractice occurred," the only exception being a minor under the full age of six years who has until his ninth birthday in which to file. Section 41-5-13. On the other hand, a common law medical malpractice claim may be brought within three years from the time that the patient discovers, or with reasonable diligence should have discovered, that a claim exists. *See Roberts*, 114 N.M. at 252-53, 837 P.2d at 446-47 (concluding that the Legislature intended to insulate a "health care provider" under the Act from the much greater liability exposure that flows from the discovery-based accrual date which applies to medical providers not covered by the Act).

**{56}** In a common law medical malpractice claim, a doctor or entity found to be negligent is liable for all actual damages proximately caused by the negligence. *See Collins ex rel. Collins v. Perrine*, 108 N.M. 714, 719-720, 778 P.2d 912, 917-918 (Ct. App. 1989) (concluding that an attorney sued for mishandling a medical malpractice claim could have secured an award of $1,500,000 for medical expenses, lost wages, the nature, extent, and duration of the injury, including disfigurement, pain and suffering, loss of enjoyment of life, and shortened life opportunity). However, under the Act, "[a] health care provider's personal liability is limited to two hundred thousand dollars ($200,000) for monetary damages and medical care and related benefits[,]" and any amount due the plaintiff in excess of this amount "shall be paid from the patient's compensation fund[.]" Section 41-5-6(D);

19

*see* NMSA 1978, § 41-5-25 (1997) (creating the patient's compensation fund to be managed and administered by the superintendent of insurance from surcharges levied on qualified health care providers by the superintendent of insurance).

**{57}** In a common law medical malpractice claim, a successful plaintiff is entitled to recover the present cash value of all "medical care, treatment[,] and services reasonably certain to be received in the future." UJI 13-1804. In contrast, under the Act, a successful plaintiff who is found to be in need of future medical care "and continuing as long as medical or surgical attention is reasonably necessary . . . shall be furnished with all medical care and related benefits directly or indirectly made necessary by the health care provider's malpractice[.]" Section 41-5-7(B). Payment "shall be made as expenses are incurred." Section 41-5-7(D). Further, when future medical care is awarded, the district court has continuing jurisdiction to enforce and modify the expenses of that care. Sections 41-5-9, -10.

**{58}** When we consider why the Act was adopted, and how the Act as a whole accomplishes its purposes, we are confident in concluding that the Act created a new statutory cause of action not recognized under the common law. It is settled that "where the [L]egislature creates a right of action pursuant to a special statutory proceeding, there is no right to a jury trial under our constitution unless the statute so provides." *Smith v. First Alamogordo Bancorp., Inc.*, 114 N.M. 340, 343, 838 P.2d 494, 497 (Ct. App. 1992). Thus, the statutory cap limiting damage awards for anything other than punitive damages, medical care, and related benefits from exceeding $600,000 does not infringe or violate Plaintiff's constitutional right to a jury trial under Article II, Section 12 of the New Mexico Constitution.

## 2. The Cap Does Not Violate Separation of Powers

**{59}** Plaintiff argues that the damages cap violates the separation of powers clause in the New Mexico Constitution because it usurps the judiciary's self-regulation and creates an unappealable remittitur. The separation of powers clause states:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive[,] and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except [where constitutionally excepted].

N.M. Const. art. III, § 1. "[T]he separation of powers doctrine precludes the [L]egislature from stepping into the judiciary's exclusive domain of prescribing the rules of judicial practice and procedure and similarly precludes the judiciary from overturning or contradicting a constitutional legislative declaration of substantive law." *In re Daniel H.*, 2003-NMCA-063, ¶ 17, 133 N.M. 630, 68 P.3d 176. In arguing that the damages cap constitutes a form of legislative remittitur, Plaintiff asserts that through the cap on damages,

the Legislature infringes on the "rules of judicial practice and procedure." *Id.*

**{60}**    In order for a trial court to grant a remittitur, "the exercise of such discretion must be supported by express reasons, and those reasons must establish the presence of passion, prejudice, partiality, sympathy, undue influence[,] or some corrupt cause or motive." *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 19, 127 N.M. 1, 976 P.2d 1 (internal quotation marks and citations omitted).  Because in a remittitur the court changes the jury's verdict, "under current practice[,] it has been held that the court must offer the plaintiff the alternative of undergoing a new trial." *Id.* ¶ 14.

**{61}**    In *Wachocki v. Bernalillo County Sheriff's Department*, we evaluated a challenge based on separation of powers and legislative remittitur to the TCA cap on damages. 2010-NMCA-021, ¶ 49, 147 N.M. 720, 228 P.3d 504.  We determined that the cap, "as a limit on damages for a cause of action created by statute," does not affect the judicial branch's ability to administer its own rules and procedures. *Id.*  We agree with *Wachocki*'s reasoning that a statutory cap does not violate the separation of powers doctrine.  While *Allsup's* established that it is unconstitutional for a court to change the jury's verdict without offering a new trial, there is a distinction between a judge requiring litigants to accept a reduction of the jury's verdict and a statute mandating that all litigants must accept a legislatively reduced verdict.  The cap is applied across the board to all litigants and requires no determination of the proportionality of a particular jury's response to a particular party. The cap, therefore, does not violate the doctrine of separation of powers.

### 3.    The Cap Does Not Violate Equal Protection

**{62}**    Plaintiff argues that the damages cap violates his right to equal protection under the Fifth Amendment of the United States Constitution made applicable to the states through the Fourteenth Amendment as well as Article 2, Section 18 of the New Mexico Constitution. We agree with Defendant that Plaintiff failed to identify a need to diverge from federal precedent based upon any properly raised assertion of broader protections contained within the state constitution and, thus, only examine the federal equal protection provision. *See ACLU of N.M.*, 2006-NMCA-078, ¶ 18.

**{63}**    The Fourteenth Amendment of the United States Constitution provides that states shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Plaintiff argues that the damages cap creates different classes of patients depending on whether they may be fully compensated, that the use of intermediate scrutiny is appropriate under New Mexico case law, and that the Act has not successfully controlled the costs of malpractice insurance and therefore fails to provide an appropriate reason for treating injured persons differently.  We disagree, apply rational basis review, and conclude that there is no equal protection violation.

**{64}**    The Act is an economic regulation that requires rational basis review under *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83 (1978) (stating that

21

"[t]he liability-limitation provision thus emerges as a classic example of an economic regulation—a legislative effort to structure and accommodate the burdens and benefits of economic life" and requiring that the law be irrational to be overturned (internal quotation marks and citation omitted)); *Wachocki*, 2010-NMCA-021, ¶ 41 ("The interests at stake in a challenge of the TCA cap are of an economic or financial nature, and this Court is unconvinced that equal protection rights are affected so substantially that intermediate scrutiny is warranted." (alteration, internal quotation marks, and citation omitted)); *Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 28, 125 N.M. 721, 965 P.2d 305 (*Trujillo III*) (determining that the cap in the TCA is economic legislation under the *Duke Power* definition and therefore receives rational basis review); *Marrujo v. N.M. State Highway Transportation Department*, 118 N.M. 753, 757-58, 887 P.2d 747, 751-52 (1994) ("The rational basis standard of review is triggered by all other interests: those that are not fundamental rights, suspect classifications, important individual interests, and sensitive classifications. This level of scrutiny applies in economic and social legislation, classifications based on property use, and business and personal activities that do not involve fundamental rights."). Other jurisdictions have reasoned similarly for medical malpractice caps when faced with an equal protection challenge. *See Hoffman v. United States*, 767 F.2d 1431, 1437 (9th Cir. 1985); *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1055 (Alaska 2002)*; Miller v. Johnson*, 289 P.3d 1098, 1120 (Kan. 2012); *Oliver v. Magnolia Clinic*, 85 So. 3d 39, 44 (La. 2012); *Robinson v. Charleston Area Med. Ctr., Inc.*, 414 S.E.2d 877, 888 (W.Va. 1991).

**{65}** Plaintiff argues that a heightened standard should be used because the cap creates a classification that does not treat similarly situated people equally. However, the Supreme Court in *Trujillo III* stated that the cap in the TCA did not receive heightened scrutiny because "the interests at stake . . . are of an economic or financial nature," and that it was not convinced that equal protection rights were affected by the damages cap. 1998-NMSC-031, ¶ 26. The Supreme Court stated that "[t]he intermediate scrutiny standard is used to assess legislative classifications infringing important but not fundamental rights, and involving sensitive but not suspect classes. For example, classifications based on gender and illegitimacy traditionally have been measured under intermediate scrutiny." *Id.* ¶ 15 (internal quotation marks and citations omitted).

**{66}** Our Supreme Court has previously found that the Act creates "a mere administrative categorization. It is a class defined by economic and bureaucratic distinctions that are far removed from racial, religious, or other fundamental categories." *Cummings v. X-Ray Assocs. of N.M., P.C.*, 1996-NMSC-035, ¶ 25, 121 N.M. 821, 918 P.2d 1321 (applying the rational basis test "to legislation directed toward business, social, and financial activities" such as the Act). The Act distinguishes merely between patients whose injuries are fully compensable and those who are prevented from receiving their full award by the cap. The distinction is based on the severity of their injury and not any factor that implicates a classification such as gender or illegitimacy. *See Trujillo III*, 1998-NMSC-031, ¶ 15. Therefore, applying the rational basis test is appropriate.

22

**{67}** Under the rational basis standard, "the burden is on the opponent of the legislation to prove that the law lacks a reasonable relationship to a legitimate governmental purpose." *Marrujo*, 118 N.M. at 757-58, 887 P.2d at 751-52 (citing *Trujillo v. City of Albuquerque*, 110 N.M. 621, 628, 798 P.2d 571, 578 (1990) (*Trujillo I*), and *Richardson*, 107 N.M. at 693, 763 P.2d at 1158). The Supreme Court in *Marrujo* noted that this is a high burden for the party contesting the legislation. 118 N.M. at 758, 887 P.2d at 752 ("[T]hey must demonstrate that the challenged legislation is clearly arbitrary and unreasonable, not just that it is possibly so."). In the light of any facts supporting the reasoning for the legislation, the court will uphold the statute. *Id.*

**{68}** Plaintiff argues that the purposes of the Act are laudable, but that they have not been accomplished and, therefore, the cap is not rationally related to the Legislature's stated purpose. That purpose is "to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers." Section 41-5-2. The Supreme Court has stated that the Act as a whole "achieves the legislative purposes of assuring that health care providers are adequately insured so that patients may be reasonably compensated for their malpractice injuries." *Cummings*, 1996-NMSC-035, ¶ 28. The Act was passed in response to an insurance crisis that "arose out of a nationwide perception that medical *malpractice* insurance was increasingly becoming unavailable." *Baker*, 2012-NMCA-073, ¶ 22. In response to the crisis, the Legislature limited heath care providers' liability through enacting damage caps, shortening the statute of limitations and mandating an evaluation process by a medical review commission while protecting victims of malpractice with ongoing coverage of their medical expenses. *See id.* ¶¶ 24-25. The Legislature hoped that the limitations on liability would provide an incentive for insurance companies to continue to provide malpractice insurance.

**{69}** To show that the Act's purposes have not been achieved, Plaintiff relies solely on the affidavit of Donald Letherer, which states that the cap has not controlled the costs of malpractice insurance and cites supporting statistics. However, this does not meet the difficult burden a challenger has to show that the legislation is arbitrary and unreasonable under *Marrujo*. 118 N.M. at 757-58, 887 P.2d at 751-52. The cap on damages is not an arbitrary response to the malpractice insurance issues. We hold that the Act is rationally related to its stated goals and that, therefore, the Act does not violate the equal protection clause of the United States Constitution.

### 4. The Cap Does Not Violate Due Process and Fundamental Fairness

**{70}** Plaintiff finally argues that, under his substantive due process rights, the cap violates a doctrine of fundamental fairness. Although he does not define what he means by "fundamental fairness," he relies on *Garcia ex rel. Garcia v. La Farge*, 119 N.M. 532, 541, 893 P.2d 428, 437 (1995), which held that "considerations of fairness implicit in the Due Process Clauses of the United States and New Mexico Constitutions dictate that[,] when the [L]egislature enacts a limitations period[,] it must allow a reasonable time within which existing or accruing causes of action may be brought." *Garcia* was a challenge to the

23

constitutionality of the statute of limitations in the Act. Because the injury in *Garcia*—cardiac arrest of the Garcias' son—occurred only three months before his parents ran out of time to sue the doctors who had failed to diagnose his condition, our Supreme Court held that the Act's statute of limitations created an unreasonably short period of time within which the Garcias could bring their suit and that it violated due process. 119 N.M. at 542, 893 P.2d at 438.

**{71}** However, *Garcia*, as a substantive due process case, relies on an analysis of the fairness of legislative classification. *Id.* at 537, 893 P.2d at 433. This is the same analysis that we performed above under Plaintiff's equal protection argument, and "[s]ince no clear due process argument is raised, we will simply restate the idea that analysis under the equal protection clause of the fourteenth amendment is identical to that used under the due process clauses." *Marrujo*, 118 N.M. at 760, 887 P.2d at 754 (alterations, internal quotation marks, and citations omitted); *Duke Power*, 438 U.S. at 93 (noting that "equal protection arguments largely track and duplicate those made in support of the due process claim"). Because Plaintiff fails to distinguish a separate basis for his substantive due process argument, we consider it to be included in our equal protection argument and find that the cap does not violate due process.

## III.   CONCLUSION

**{72}** For the reasons stated above, we affirm the district court's decisions with relation to Defendant's duty to Plaintiff, issuance of jury instructions, and refusal to grant further remittitur or grant Defendant a new trial. We also affirm the district court's order reducing the $1,000,000 verdict because the damages cap contained in the Act is constitutional.

**{73}   IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Chief Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Judge**

_____
**J. MILES HANISEE, Judge**

**Topic Index for *Salopek v. Friedman*, No. 30,307**

**CONSTITUTIONAL LAW**
Due Process
Equal Protection

24

Separation of Powers
Trial by Jury

**JURIES**
Right to Trial by Jury

**JURY INSTRUCTIONS**
Civil Jury Instruction

**NEGLIGENCE**
Duty
Foreseeability
Personal Injury
Proximate Cause
Standard of Care

**REMEDIES**
Additur and Remittitur
Loss of Consortium
Pain and Suffering
Proof of Damages

**TORTS**
Loss of Consortium
Medical Malpractice
Negligence